Filed 10/22/15  P. v. Walker CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D068683 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF1102631) |
| DAVEL D. WALKER, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside County, Angel M. Bermudez, Judge.  Reversed in part and remanded with directions.


Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Christine Bergman, and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Davel Walker of first degree murder during the commission of a robbery and burglary and found true allegations of felony-murder special circumstances. Walker was sentenced to life imprisonment without the possibility of parole. On appeal, Walker contends that there was insufficient evidence to support true findings on the felony-murder special circumstances allegations. (Pen. Code, § 190.2, subds. (a)(17) & (d).)[1] We agree and reverse those findings.

### FACTUAL AND PROCEDURAL BACKGROUND

Walker's culpability for first degree felony murder is not in dispute. We address only those facts relevant to our discussion of whether there was sufficient evidence to support the true findings on the felony-murder special circumstances allegations. We recite the evidence in the light most favorable to the jury's verdict.

The victim, Theron Brison, had worked at Valley Wide Counseling ("Valley Wide") as a therapist for over 20 years. He was studying to be a Mason and was a bass guitar player. He was the last employee at work on the evening he was murdered. A month or so prior to the murder, Corey Macedon was terminated as an employee of Valley Wide. Macedon had worked at Valley Wide for about a year, first as an intern and then as a drug abuse counselor, during which time he was mentored by Brison and gained familiarity with Valley Wide's schedule, procedures, and employees. Macedon, also a Mason, was fired after he was found to be stealing client funds. Although

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

2

Macedon had committed thefts in the past, there was no evidence adduced at trial that he had ever seriously injured anyone before.

Walker and Macedon were cousins. As children, they spent a lot of time together; Macedon, who was the dominant one of the pair, frequently acted aggressively and/or violently toward Walker. As a result of severe childhood sexual and/or physical abuse by his elders and strangers, Walker had ongoing mental health conditions that required treatment and anti-anxiety, anti-depressant, and anti-psychotic medications.[2] He was a chronic user of medical marijuana. Walker was often homeless and had been convicted of several felonies involving theft in 1997 and 2000. Between 2004 and 2011, Walker had no contact with Macedon. They reconnected in May 2011, and in early October 2011, Walker began staying with Macedon.

According to Walker, on the afternoon of October 13, 2011, Macedon, Walker, and their mutual female friend CeCe were hanging out together at a deli. They smoked marijuana and chatted. Macedon mentioned to CeCe the idea of going on a "mission," which meant "to find a way to get money by either selling something or . . . robbing

---

[2] Walker testified that he had been sexually molested by his grandfather and sold by his father to pedophiles to fund his father's heroin addiction. Walker's past disclosures of sexual abuse were contained in psychiatric and medical files. An expert testified that Walker suffered from posttraumatic stress disorder, and when confronted by additional traumatic situations, his anxiety and depression would most likely recur or worsen. Under the hypothetical circumstances of being placed in a stressful situation with a dominant male who had caused childhood trauma (e.g., Macedon), the expert opined that Walker would attempt to lower his anxiety and fear, such as by being submissive. The expert also opined that even though it may have been difficult for Walker to "speak up" against his cousin, he still could have conceivably done so, and in fact, had demonstrated some resistance on the night of Brison's murder.

stuff." In the early evening, the three individuals set off to two different clothing retail stores. At both locations, Macedon and CeCe stole some items while Walker either pretended to shoplift or waited in the car. Next, they stopped at Macedon's estranged wife's home to get some clothes; while there, Walker and CeCe played video games and smoked marijuana outside.

Around 8:00 or 9:00 p.m., Macedon, Walker, and CeCe left the home in Macedon's car. Macedon said that he wanted to go to his former place of employment, Valley Wide. Walker did not know that Macedon had been fired because Macedon had told Walker that he had "quit." Macedon began describing a "deal" he had with a fellow "Mason brother" who worked at Valley Wide. The deal was that Macedon would enter Valley Wide, take some computers and a server and make it look like a robbery, and also take the Mason brother's car and guitar, for which an insurance claim could be filed. Macedon insisted that Walker accompany him, and made explicit and implicit threats of harm to Walker and/or Walker's friends if Walker were to refuse to assist Macedon. During the 40 minutes that Macedon and Walker were outside of Valley Wide, Walker pleaded with Macedon that he was not needed there, until Macedon finally agreed that Walker could stay in the front lobby to make sure that no one else came in while Macedon was gathering the items he intended to take.

Before entering Valley Wide, Macedon put on gloves and a ski mask, but left the mask rolled up at his eyebrow area. Walker testified that Macedon was quirky and had certain ritualistic habits, and to Walker, Macedon's actions seemed consistent with those quirks and with an attempt to make the scene look like a robbery had taken place.

4

Macedon gave Walker one glove for his left hand, which Walker put on. The previous week, Walker had fractured and injured his right hand. Walker testified that he exaggerated the pain from the fracture as an excuse to minimize his participation. The door to Valley Wide was unlocked. After Macedon and Walker entered, Walker stayed in the front lobby. Macedon had instructed him to delay and/or tie up anyone who came in.

Walker testified that Macedon went back into an office next to a conference room. From the lobby, Walker heard a "thump or two," like somebody "hitting their hand against the wall or against a chair or something." About 30 seconds later, Macedon called out something like: "D, get me some cords." Walker walked into the office, where he observed Brison lying on the ground on his left side. Brison was coughing, and Walker observed liquid coming out of Brison's mouth. Brison was breathing heavily and bleeding from a "busted lip." Macedon repeated his demand for cords, and Walker pulled gray telephone cords out from the office's desk phones and handed them to Macedon. Walker saw Macedon use a cord to make "a loop, or something" around one of Brison's hands. Brison was still lying on his side or stomach as Macedon was beginning to bind Brison's hands. Brison's eye glasses were askew on his face, but he was conscious, made eye contact with Walker, and did not beg for help or say anything. At that point, although Walker had serious doubts that the robbery was actually an inside job or a prearranged deal, he also thought that Brison would be fine and that it was possible that Macedon was making it "look like a robbery."

5

Next, thinking that he had done his part, Walker made his way through the office and a hallway, heading toward the back door. CeCe had been instructed to park the car at the back of the building. Before Walker reached the back door, Macedon called him back to go to a different area where a safe was kept. Macedon wanted Walker to help him move the safe. They tried to move the safe, but it was too heavy. Macedon then ordered Walker to get out and tell CeCe to come in. Walker testified that he went out the back door to the car, began smoking marijuana, and did not see Brison again.[3]

According to Walker, for the next 35 minutes or so, Macedon and CeCe moved and stacked computers and other items by the back door and put them into Macedon's car. In addition, Macedon loaded a server and other items into Brison's truck. Walker testified that he stayed in Macedon's car, smoked, and opened the trunk when ordered to do so. When the loading was complete, CeCe and Walker waited outside for a few minutes for Macedon while Macedon was by himself inside Valley Wide. While leaving Valley Wide, CeCe drove Macedon's car with Walker sitting in the front passenger seat, and Macedon drove Brison's truck.[4] Brison's truck ran out of gas and Macedon had to

_____

[3] During a police interrogation, when asked whether his DNA would be found on anything at Valley Wide other than the telephone cords, Walker indicated there were "times [Macedon] had me go through there to . . . grab the extra mouses and stuff out the . . . offices. [¶] That he stacked up there. And then to grab that . . . ." Based on our review of the entire record, the jury could reasonably infer that Walker may have helped to move or load stolen items.

[4] The general timing of events was corroborated by testimony from other witnesses and surveillance footage obtained from a nearby storage facility.

6

abandon it, but he took Brison's guitar out of the truck with him. The group reunited in Macedon's car.

Brison's body was discovered the following morning shortly after 8:00 a.m. The interior of the Valley Wide office was in complete disarray and computers and equipment were missing from various offices. Brison was found lying on his stomach, with a white sheet draped over the top of his head. He had been "hogtied with an Ethernet-type cord"—his wrists were bound together, his ankles were bound together, and his wrists and ankles were bound together. The bindings were comprised of telephone and computer cords. One of Brison's socks had been wadded up and wedged into his mouth. The sock was held in place with Brison's tie, which was wrapped around his neck and knotted.

A forensic pathologist who performed Brison's autopsy testified that Brison had sustained external injuries, including abrasions, contusions, and lacerations, that were consistent with an assault. Brison had suffered a brain hemorrhage indicative of blunt force trauma. The official cause of death was "[a]sphyxia due to obstruction of airway with positional compromise, and strangulation by bindings, with other significant conditions, blunt impact injuries to the head." Asphyxia, which is a lack of oxygen to the tissues, could have been caused by Brison not getting enough air as well as not getting blood flow to parts of his body, such as his head. The pathologist testified that the injuries to Brison's head caused a loss of consciousness or a decreased level of consciousness, both of which would have contributed to difficulty breathing. After the gag and bindings were applied, Brison likely died within minutes if not sooner, but he

7

might have lived for up to 30 minutes or an hour, depending on his overall health and ability to breathe through his nose. The pathologist stated that absent the bindings and airway obstruction, lying on one's stomach or having one's hands tied behind one's back is not fatal, since people are frequently handcuffed in that manner and they do not die. The pathologist's opinion was that Brison's death was caused by a combination of factors.

Criminalists performed DNA testing and analysis on two telephone cords/cables that were used to bind Brison. For the first cord, which was gray, DNA results showed Brison was a major donor and there were two unknown minor donors. For the second cord, which was blue, the DNA results showed Brison as a major donor and one unknown minor donor. For the unknown minor donors, there was not enough DNA detected for comparison purposes. No DNA foreign to Brison was detected on several other items that were submitted for DNA testing, including other telephone cords and Brison's clothing, tie, and sock.

Investigators discovered that Brison's work-issued credit card was still being used for in-store transactions the day after his death. Beginning in the early morning hours and continuing into the afternoon on October 14, 2011, Macedon used the credit card to purchase food, DVDs, cigarettes, and shoes, at various locations. At around 2:00 p.m. that day, surveillance footage showed Walker using Brison's credit card to purchase cigarettes at a supermarket. Walker testified that Macedon had given him the card to use, he did not connect the card to the person he had seen at Valley Wide the night before, and he did not know that the person (Brison) was dead. The credit card was cancelled at around 4:00 p.m. After 5:00 p.m. that day, surveillance footage from a sporting goods

8

store showed Walker attempting to use Brison's credit card to purchase shoes, but the transaction did not go through. According to Walker, Macedon had insisted upon the attempted purchase of shoes, and Walker still did not connect the credit card to the events at Valley Wide.

Walker testified that he did not find out about Brison's death until the afternoon of October 15, 2011, when he read about it in a news article. Walker was shocked and confronted Macedon, who denied that he had killed Brison, but disclosed that he had placed a false identification under Brison's body to try to throw off the police. By this time, Walker suspected that Macedon had killed Brison. Officers arrested Walker several weeks later. During a custodial interrogation, Walker gave a taped confession regarding his participation in the robbery and burglary consistent with what he would ultimately testify to at trial. Several days after the police interrogation, Walker relayed the same events in a recorded jailhouse telephone call to a friend. Both in these pretrial statements and at trial, Walker admitted that he knew a burglary would occur and acknowledged his role in it, but consistently maintained that he did not know that anyone would be killed, that he had not killed anyone, that he had not seen the victim fully bound and gagged, and that when he left Valley Wide, he had "no reason to think" that the man he later learned was Brison would not be "all right."

A jury convicted Walker of first degree murder (§ 187, subd. (a)) and found true the special circumstances that the murder was committed during a robbery and a burglary (§ 190.2, subd. (a)(17)(A) & (G)). Walker admitted two prior strike convictions. The

9

People did not seek the death penalty, and Walker was sentenced to life imprisonment without parole.

After the close of briefing on appeal, the California Supreme Court published *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*). We requested supplemental briefing on the impact, if any, of *Banks* on the issues raised in the appeal. Both parties filed supplemental letter briefs in response to our request.

DISCUSSION

## I. *Standard of Review*

When reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt. (*People v. Boyce* (2014) 59 Cal.4th 672, 691.) These same standards apply to challenges to the evidence underlying a true finding on a special circumstance. (*Edwards*, at p. 715.)

## II. *Felony-murder Special Circumstances*

Walker contends that there is no substantial evidence to support true findings on the felony-murder special circumstances. "In order to support a finding of special circumstances murder, based on murder committed in the course of robbery, against an

10

aider and abettor who is not the actual killer, the prosecution must show that the aider and abettor had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony.  (§ 190.2, subds. (c), (d).)"  (*People v. Proby* (1998) 60 Cal.App.4th 922, 927 (*Proby*).)

We agree with Walker that there is no substantial evidence to support a finding that he was an actual killer or that he had the intent to kill, and the People do not argue otherwise.  The question, then, is whether there is substantial evidence that Walker acted with "reckless indifference to human life while acting as a major participant in the underlying felony."  We assume without deciding that substantial evidence supports a finding that Walker was a "major participant" in the underlying robbery and burglary.[5]

" '[R]eckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death."  (*People v. Estrada* (1995) 11 Cal.4th 568, 577.)  Our Supreme Court has instructed that in assessing whether a defendant participated in "criminal activities known to carry a grave risk of death," one or more factors may be considered and weighed:

---

[5]     In Walker's opening and reply briefs, he assumed that there is substantial evidence to support a finding that he was a major participant in the underlying felonies.  He argued for the first time in his supplemental letter brief that he did not qualify as a "major participant" under *Banks*.  The "major participant" legal standard existed well before the publication of *Banks*, and Walker could have raised the issue in his initial briefing.  He may not raise the argument for the first time in a supplemental letter brief.  Even if he had properly made the argument, there would be no change to the disposition of this case.

11

"What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?"

(*Banks*, *supra*, 61 Cal.4th at p. 803 [discussing *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*)].) Although there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life, a person who participates in enumerated crimes in the felony-murder statute (such as robbery or burglary) is not automatically deemed to have exhibited reckless indifference to human life. (*Banks*, at p. 810; *Tison*, at p. 158, fn. 12.) Rather, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, at p. 801.) The standards articulated in *Banks*, although developed in death penalty cases, are equally applicable in cases involving statutory eligibility under section 190.2 (d) for life imprisonment without parole. (*Id.* at p. 804.)

There is not substantial evidence to support a finding that Walker was subjectively aware that his participation in the robbery and burglary at Valley Wide created a grave risk of death. There was no evidence that Walker had a role in planning the burglary or that he had any connection to the location; rather, Walker's cousin Macedon was the one who had worked at Valley Wide and was familiar with the schedule, people, and assets. In addition, the record does not support that either Macedon or Walker was armed, that

12

Macedon was known to have seriously injured, much less killed, anyone in the past, or that Walker would have any reason to think that Macedon intended to kill on this occasion. There is no evidence to refute that the two entered Valley Wide without force. Walker testified that he provided Macedon with telephone cords at Macedon's request, but telephone cords cannot reasonably be deemed to be an obviously lethal weapon. Although Walker became aware that Brison would be tied up, there is insufficient evidence that he knew the manner in which Macedon would bind Brison or that he was aware that the extent of the bindings could or would lead to Brison's death. Similarly, there is insufficient evidence that Walker knew that Brison would be gagged.[6] Accordingly, there is not substantial evidence to support a finding that Walker realized that Macedon had placed Brison in a life threatening position such that Walker had a "subjective awareness of the grave risk to human life" created by his participation in the underlying felonies.[7]

The cases on which the People rely, in which defendants assisted in, or fled, shootings and stabbings, are inapposite. (See, e.g., *Proby*, *supra*, 60 Cal.App.4th at p. 926 [victim shot in the course of armed robbery at fast food restaurant, where

---

[6] The People argue somewhat inconsistently that Walker saw fluid coming out of Brison's mouth, yet maintain that Walker saw Brison with a sock in his mouth. This is not necessarily inconsistent since the sightings of Brison could have occurred at different points in time. However, based on our review of the record, there is no substantial evidence from which it can be inferred that Walker saw Brison gagged.

[7] In the People's supplemental letter brief, the People assert that Walker was "present during the murder" of Brison. There is no evidence in the record to support this statement, nor is there evidence from which such an inference may be reasonably drawn. There was no evidence that Brison was even unconscious when Walker last saw him.

13

defendant provided gun and had engaged in prior armed robbery with killer, who had previously locked employees in a walk-in freezer].) In *People v. Smith* (2005) 135 Cal.App.4th 914, while the defendant stood outside a motel room door as a lookout, the victim was "stabbed and slashed 27 times, beaten repeatedly in the face with a steam iron, and had her head slammed *through* the wall." (*Id.* at p. 927.) The actual killer "emerged from her room covered in enough blood to leave a trail" from the motel to the street. (*Ibid.*) Defendant showed a reckless indifference to human life where it could be inferred he "monitored and guarded the increasingly lengthy, loud, and violent attempted robbery-turned-murder," and then chose to flee rather than going to the victim's aid or summoning help. (*Id.* at p. 928.) In the cited cases, at the very least, defendants were aware that an accomplice was armed with a deadly weapon, and/or that lethal force was used, or that a victim had been seriously injured.

In contrast, there is no substantial evidence from which one could reasonably infer that Walker was aware that Brison had been seriously injured or that Walker knowingly contributed to the infliction of Brison's injuries. According to Walker's testimony, he heard Macedon beating Brison, but there is no evidence to contradict Walker's testimony that when he last saw Brison, Brison was conscious and breathing, with only his hands tied and no gag in his mouth. According to the pathologist, the blunt force trauma inflicted by Macedon on Brison did not, by itself, cause his death. Even if the jury rejected Walker's "inside job" explanation, there is insufficient evidence to support a finding that Walker actually knew that Brison was at risk of dying and was in need of urgent help.

14

The culpability of nonkiller felony murderers falls on a continuum, and only *knowingly* creating a "grave risk of death" satisfies the constitutional minimum for death penalty eligibility and felony-murder special circumstances. (*Banks*, *supra*, 61 Cal.4th at p. 811; *Tison*, *supra*, 481 U.S. at pp. 139-141 [defendants brought a cache of weapons to prison, armed both murderers, and held at gunpoint guards and visitors; after prison break, they participated in stopping and robbing a family, then stood by while all four family members were shot].) Based on our review of the record, no rational trier of fact could have found that the evidence supported true findings as to Walker on the felony-murder special-circumstances allegations.

## DISPOSITION

The jury's findings on the robbery and burglary felony-murder special circumstances are reversed, and the matter is remanded for resentencing. In all other respects, the judgment against Walker is affirmed.

AARON, J.

WE CONCUR:

McDONALD, Acting P. J.

O'ROURKE, J.